

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, EX REL. PAMELA VICKARYOUS, an individual, <br><br> Relator, <br><br> v. <br><br> MASON CLASSICAL ACADEMY, INC., a Florida not for profit corporation, and KELLY LICHTER, an individual, <br><br> Defendants. | CIVIL ACTION <br><br> Case No. 2:21-cv-659-SPCNPM <br><br> Judge: <br><br> Mag. Judge: <br><br> FILED *IN CAMERA* AND UNDER SEAL |

**COMPLAINT FOR DAMAGES AND OTHER RELIEF UNDER THE QUI TAM PROVISIONS OF THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL**

NOW COMES the Relator, **PAMELA VICKARYOUS** ("VICKARYOUS"), by and through undersigned counsel, on behalf of the United States of America ("United States") and brings this action against Mason Classical Academy, Inc. ("MCA") and Kelly Lichter ("Lichter") (collectively "Defendants"), under the False Claims Act, 31 U.S.C. §3729 et. seq. ("FCA"), and in support of the Complaint, the Relator alleges as follows:

**PRELIMINARY STATEMENT**

1. Congress passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") in part to provide emergency relief to small businesses facing

1

S-2

payroll difficulties. Section 1102(a)(2) of the CARES Act amended Section 7(a) of the Small Business Act, 15 U.S.C. § 631 et seq., to establish the Paycheck Protection Program ("PPP"). 15 U.S.C. § 636(a)(36). The SBA administers the PPP to provide relief expeditiously to small businesses experiencing economic hardship as a result of coronavirus measures. PPP loans are taxpayer dollars intended to help the needy – not the greedy.

2. Under U.S. Department of Treasury guidance, an organization that applies for PPP money must certify that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Unfortunately, this also attracted opportunistic bad actors like the Defendants.

3. In submitting PPP loan applications to the SBA, Lichter – on behalf of MCA – falsely certified (i) that it was eligible to receive the loan, and (ii) that it would use the loan in a manner consistent with the requirements of the CARES Act. As shown however, MCA had already received all of its funds for operations of the school and was in a very strong financial position. No other funds for continuing operations were coming from the Collier County School District, and MCA does not rely on private donations. Instead, MCA – through Lichter – illegally lined its own pockets off the backs of American taxpayers and concealed and avoided its obligation to repay PPP loans to the SBA, despite knowing that it was not eligible for the loans it had received.

## PARTIES

4. Defendant MCA is a Florida not for profit corporation located in Naples, Florida that employed the Relator as its principal. MCA is a private company founded by Defendant Lichter that operates a charter school and has a contract with Collier County Public Schools to provide elementary, middle and secondary school education to students in Collier County, Florida, and it has done so since 2014. Pursuant to F.S. §1002.33(7), a charter school contract was executed between MCA and Collier County Public Schools, which sets forth the terms and conditions for MCA's operation.

5. However, in 2018, Collier County Public Schools initiated an investigation into MCA and on June 3, 2019, it issued a 61-page report that concluded MCA's Board of Directors – including Lichter – violated the law, MCA's policy, and MCA's board norms and values, as well as engaged in improper social media and email communications and breached the terms of the Charter Agreement by their actions. The report also concluded MCA's then-principal violated federal and state law, Defendant's policy, the Code of Professional Conduct, and mismanaged the Best and Brightest Program.

6. MCA's former compliance officer also observed a litany of illegal conduct by the Defendants, which included but is not limited to: (i) intentional concealment of public records, (ii) obfuscation of valid public records requests, (iii) Board Members directing the day-to-day affairs of the school's operations, (iv)

3

Board Members utilizing private email addresses to conduct Board business, (v) Board Members conducting business outside of publicly posted meeting agendas, (vi) Board Member failing to disclose his financial interest in a private healthcare insurance company and inducing MCA to enter into a contract with it, (vii) Board Member(s) knowingly approving a contract where a Board Member intentionally failing to publicly disclose his financial interest in a private healthcare insurance company, and (viii) utilizing a private email server in order to conceal public records. Several Board Members conspired – and did – accomplish these illegal ends, which are in violation of a multitude of laws, including but not limited to F.S. §286, F.S. §1002.33, F.S. §112.313(3) and F.S. §112.3143.

7. The Relator began her employment with MCA in early October 2019 and was employed as its principal until June 2020. She too observed what the compliance officer did, but also observed that MCA – through Lichter's false certification – illegally procure and retain PPP funds.

8. The Relator brings this action on behalf of the United States. The United States, acting through the SBA, has disbursed to in excess of $830,000 in PPP money to the Defendants.

## CAUSES OF ACTION

9. This is an action to recover treble damages and civil penalties on behalf of the United States against the Defendants for submitting and causing to

be submitted false claims to the United States under the PPP ("Program"), from March 2020 through present ("Relevant Period").

10. The Defendants perpetrated these schemes in order to fraudulently obtain federal PPP monies to which they were not entitled.

11. As a result of her employment with Defendant MCA, Relator has first-hand knowledge and information regarding the business operations and fraudulent claims for Program monies paid by the Government Program.

12. Relator brings this action based on direct and independent knowledge. None of the actionable allegations set forth in this Complaint are based on a public disclosure as set forth in 31 U.S.C. §3730(e)(4). Notwithstanding the same, Relator is an original source for the facts alleged in this Complaint. The facts and circumstances of the Defendants' violations of the FCA have not been publicly disclosed in a criminal, civil, or administrative hearing; nor in any legislative, administrative, or inspector general report, hearing, audit, or investigation, or in the news media. As a result of her employment with Defendant MCA, Relator has first-hand knowledge of the business operations of the Defendants and their intentional and/or reckless disregard and fraudulent conduct in connection with their knowledge, supervision and direction of the illegal and fraudulent practices carried out by the Defendants.

## JURISDICTION AND VENUE

13. These claims arise under the Qui Tam provisions of the FCA. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and 31 U.S.C. §3732 which specifically confer jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730.

14. Personal jurisdiction and venue for this action are predicated on 31 U.S.C. §3732(a) which provides: "any action brought under §3720 may be brought in any judicial district in which the defendant, or in the case of multiple defendants, any one defendant, can be found, resides, transacts business or in which any act proscribed by §3729 occurred." Defendant MCA is a Florida corporation that conducts its business in, among other places, Collier County, Florida, which is within the Middle District of Florida, Ft. Myers Division. Defendant Lichter is an individual who is domiciled in Collier County, Florida.

15. Venue is proper in the United States District Court for the Middle District of Florida because the Relator resides in, and the Defendants conduct business in, and some or all of the events giving rise to Relator's claims occurred in Collier County, Florida, which is within the Middle District of Florida. Venue is proper in the Fort Myers Division under Local Rule 1.02(b)(5) since Collier County is within the Fort Myers Division.

16. Under §3720(b)(2) of the FCA, this Complaint is to be filed *In Camera* and remain under seal for a period of at least sixty (60) days, and shall not be

served on the Defendants until to Court so orders. The government may elect to intervene and proceed within sixty (60) days after it receives both the Complaint and the material evidence and information.

17. Simultaneously with the filing of this Complaint, as required under the FCA, Relator has provided to the Attorney General of the United States and the United States Attorney for the Middle District of Florida a statement of all of the material evidence and information relating to the Complaint ("Disclosure Statement"). The Disclosure Statement supports the existence of false claims by the Defendants.

### A. The False Claims Act.

18. The FCA reflects Congress' objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986).

19. The FCA imposes liability upon any person who (a) "knowingly presents or causes to be presented [to the Government] a false or fraudulent claim for payment or approval"; (b) "knowingly makes, uses, causes to be made or used, a false record or statement material to a false or fraudulent claim," (c) conspired to defraud the Government by getting a false claims allowed or paid or (d) knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government," is liable to the United States for a civil penalty of not less than $5,500.00 and not more than

$11,000.00, plus three (3) times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. §3729(a)(1)(A)-(C), as amended.

20. The FCA imposes liability not only for the intentionally false or fraudulent conduct, but also where the conduct is merely "in reckless disregard of the truth or falsity of the information." 31 U.S.C. §3729(b)(1)(A)(iii).

21. The FCA broadly defines a "claim" as one that includes "any request or demand, whether under a contract or otherwise, for money or property… that… is made to a contractor, grantee or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, if the United States Government- (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse any portion of the money or property requested or demanded." 31 U.S.C. §3729(b)(2)(A).

**B. The CARES Act.**

22. On March 27, 2020, Congress enacted the CARES Act, which empowers the SBA to make loans to eligible small businesses under the PPP to keep workers paid and employed. The PPP is codified as amendments to the Small Business Act, at 15 U.S.C. §§636(a)(36), *et seq.*

23. As relevant here, the maximum loan amount allowed under the PPP is calculated as 2.5 months of average payroll costs incurred by the applicant, plus any outstanding amounts of any Economic Injury Disaster Loan (EIDL).

24. "Payroll costs" are defined to include "salary, wage, commission, or similar compensation." 15 U.S.C. §636(a)(36)(A)(viii).

### C. PPP Loan Certifications.

25. To receive a PPP loan, a borrower must first complete the Borrower Application Form ("PPP application").

26. The PPP application requires the borrower to certify, *inter alia*, that the applicant "is eligible to receive a loan" under the PPP, and that it will use loan proceeds "consistent with the "Paycheck Protection Program Rule."

27. The Paycheck Protection Program Rule is defined in the PPP application to mean the CARES Act.

### D. The Defendants' Fraud.

28. MCA's governing documents require that its governing Board formally grant authority to submit an application or enter into an agreement for a loan, such as a PPP loan. MCA Board Policy A5.0 explicitly states "Borrowing of funds, including the issuance of bonds, equity line of credit, unsecured or secured business loans, or any other material debt <u>must</u> be approved in advance by the school's board of directors. Debt should be avoided except for extraordinary circumstances (such as for large capital purchases). Debt to finance continuing

9

operations of the school is discouraged." (Emphasis added)(*See* Exhibit 1 - MCA Policy A5.0). However, MCA's Board never once voted on applying for a PPP loan. Astonishingly, the MCA Board did not even discuss any COVID-19 related financial impacts during the meeting (which makes sense given Lichter's sworn testimony discussed below). Instead, all the meeting minutes leading up to the PPP Loan Application indicate MCA was hell-bent on terminating the Relator, who 2-weeks earlier had reported MCA to the State of Florida for the wrongs identified in ¶¶5-6 above. MCA's Finance Committee had not even discussed a PPP loan prior to May 5, 2020, despite having met a week earlier.

29.     On April 22, 2020, Lichter submitted an application for a PPP loan for MCA in the amount of $830,503.63. (*See* Exhibit 2 - MCA's PPP Application). However, Lichter was *not* an "authorized representative." Indeed, SBA PPP FAQ #11 warns borrowers that, as the Borrower Application Form indicates, only an authorized representative of the business seeking a loan may sign on behalf of the business:

> An individual's signature as an "Authorized Representative of Applicant" is a representation to the lender and to the U.S. government that the signer is authorized to make the certifications, including with respect to the applicant and each owner of 20% or more of the applicant's equity, contained in the Borrower Application Form.

30.     Lichter misrepresented – under oath – that she was an "authorized representative." (*See* Exhibit 3, ¶¶1-6 – Certification of Authority and Good

Standing). In fact, Lichter acknowledged that "this Certification is a material inducement to Lender for granting and making the Loan to Borrower and that absent this Certification Lender would not have made the Loan." She affirmed the same in the Hold Harmless and Release Agreement. (*See* Exhibit 4 - Hold Harmless and Release Agreement). But Lichter did so without authority or any MCA Board discussion or findings related to the criteria for the loan. In so doing, Lichter made false statements in applying for the federal loan – statements that MCA became complicit in by their conduct in taking the loan and in their attempt to cover up the improper process that was undertaken to obtain the loan.

31. On the PPP Borrower Application (SBA Form 2483), Lichter further certified – under the penalty of perjury, and without MCA Board approval – the following:

- "Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant."

- "I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud."

- "I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000."

32. Certifications supporting the PPP loan application should be documented, reviewed and approved by the Board. Such written record should demonstrate that a *bona fide*, good faith effort was undertaken to support the certifications truthfully. That did not happen and on May 5, 2020, Lichter signed the SBA Settlement Sheet for SBA Loan #42032772-10, which shows MCA receiving $830,500.00 as a PPP loan. (*See* Exhibit 5 - SBA Settlement Sheet). That same day, Lichter signed the Note. (*See* Exhibit 6 - SBA Note). Failure to disclose any material fact to the lender or SBA is an event of default under ¶4(D) of the Note, as does making "a materially false or misleading statement to Lender or SBA," which is in ¶4(E). And pursuant to ¶9(A), "[a]ll individuals and entities signing this Note are jointly and severally liable."

33. However, Lichter was deposed on April 19, 2021 by undersigned Relator's counsel, and provided damning admissions under oath that demonstrate the PPP Loan was procured through fraud.

34. First, Lichter testified that as the pandemic was starting to unfold in March 2020, she was not concerned that it would have any adverse effect on MCA's financial position. (*See* Exhibit 7 – Deposition of Lichter, Depo. p. 110). In fact, she further testified that there was no attrition of students from MCA, which had transitioned to teaching virtually. (p. 111). Charter schools like MCA receive their funding on a per capita basis, meaning if there was no student attrition, there was also no decrease in MCA's income. As Lichter explained under oath, just

12

before the pandemic began, MCA had already had its February census done "[s]o whether we lost a ton of students, we had already been paid is my understanding." (p. 111). Lichter testified that the next census was not until October 2020. Importantly, when asked if MCA was pretty solid from a financial standpoint, Lichter testified "yes." (p. 112). MCA's audited financial statements also support Lichter's testimony as to MCA's financial strength and the fact that MCA's loan request was completely *unnecessary* to support its ongoing operations. Her testimony confirms the falsity of her certification that "current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Stated simply, MCA did not need the money, and so strong was its financial position that it recently purchased an entire new campus for a purchase price of $10 million (financed through Synovus Bank). As Lichter stated to the news media: "With this expansion we've been able to give more access to the education that parents desperately want. I think it's going to take us to the next level. We not only have survived but we have thrived."

35. As seen, Lichter's sworn testimony and public statements show that the Borrower Application Form – which she signed under the penalty of perjury – contains materially false statements designed to fraudulently obtain and retain a PPP loan in the amount of $830,500.00. Based on Lichter's misrepresentations, First Federal Bank processed the loan on behalf of the SBA and MCA fraudulently obtained $830,500.00 as a PPP loan. More specifically, Lichter flat-out lied to the

lender and SBA when she certified that she was an authorized representative and that the "current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Contrary to what Lichter affirmed to the United States in procuring $830,500.00, MCA did not conduct a financial needs assessment prior to applying for the loan; did not identify *any* past or current economic impacts; nor did it articulate a clear and present rationale for the loan. Nor could it, as MCA funds from the State and Collier County Public Schools were allocated to ensure payroll funding as well as other means of accessing credit, capital, or other sources of liquidity. It is clear that MCA acquired the PPP loan to increase its reserves in anticipation of future need, not to mitigate past or current economic hardship – the "current" nature of the "economic need" to which applicants must attest is for short-term cash-flow hardships created by current, and not future anticipated, COVID-19 related impacts. This is confirmed by MCA's Audited Financial Statement, which "offers the following narrative overview and analysis of the financial activities of the School for the fiscal year ended June 30, 2020." (*See* Exhibit 8 - Audited Financial Statement). MCA's auditors noted that "[t]he change in current assets is a result of an increase in operating cash due to the proceeds received in connection with the Paycheck Protection Program (PPP) loan." (*Id.*, p. 3). At that time, MCA had not spent the PPP monies as required by the terms of the loan. Indeed, state education funding was not impacted by COVID-19 expressly to ensure funding to pay teachers and

staff in the 2019-20 school year (during the term of the loan), and MCA was assured of its ongoing average daily attendance revenue during the precise timeframe of the loan. MCA's revenues for operations are received primarily from the District School Board of Collier County. In accordance with the funding provisions of the charter and Section 1002.33, Florida Statutes, MCA reports the number of full-time equivalent (FTE) students and related data to the School District. The School Board receives a 2% administrative fee from MCA. Under provisions of F.S. §1011.62, the District reports the number of students and related data to the Florida Department of Education (FDOE) for funding through the Florida Education Finance Program (FEFP). Funding for MCA is adjusted during the year to reflect the revised calculations by the FDOE under the FEFP and the actual weighted full-time equivalent students reported by MCA during the designated full-time equivalent student survey period.

36. The fact that Lichter applied for the PPP loan as MCA's "Authorized Representative or Applicant," plainly demonstrates that she was without authorization to engage, apply for, or obtain a PPP loan from on MCA's behalf. Not only is her conduct without authorization, it was contrary to the charter and state and federal law governing transparency. Additionally, the misrepresentations to obtain the loan violate the duty to be honest in seeking state or federal loans and therefore constitute fraud. MCA participated and adopted

those false statements in accepting the loan that was obtained based on the misrepresentations.

37. At no point did MCA's Board take any action to even evaluate the need for the loan or make any public representation in seeking the loan. Nowhere did the MCA Board even acknowledge Lichter's May 5th loan application or her unauthorized acceptance of the PPP loan. Given the timeline of events outlined above, the MCA Board did not undertake any assessment of a COVID-19 related economic need for a PPP loan before or at the time the loan application was submitted as was required by the SBA PPP FAQ #31. Lichter's misrepresentation to the United States of MCA having a "current need" for funding for the intended purposes of the PPP loan was absolutely false. Nor was there any need or basis for the loan discussed or referenced in any MCA Board meeting minutes.

38. The PPP loan was a short term payroll loan, not a loan for speculative future need since the intent of the CARES Act was to mitigate immediate COVID-19 hardship so that businesses would not have imminent closures. But MCA – through Lichter's misrepresentations – fraudulently obtained the $830,500.00 PPP loan, of which $802,550.00 was forgiven on or about November 10, 2020.

39. The CARES Act was, as Congressman Huffman points out, "not meant to provide an extra layer of funding for charter school entities." It is clear that MCA's PPP Loan was not obtained through the proper and required approval process nor for the stated purposes of the PPP funding. The loan application

included false and misleading statements as to the basis upon which the loan was acquired. As a result, the Defendants have violated the FCA.

## COUNT I- FEDERAL FALSE CLAIMS ACT: PRESENTATION OF FALSE CLAIMS

40. Relator incorporates by reference paragraphs 1-39.

41. As described above, Defendants knowingly presented or caused to be presented false claims for payment to the SBA in the form of fraudulent loan applications. Defendants falsely certified on these forms that MCA was eligible to receive the PPP loan, and that they would use such funds consistent with the CARES Act.

42. The submission of these false applications caused the SBA to pay out monies that it would not have paid if it had known of the falsity of Defendants' certifications.

43. The SBA and the banks administering PPP loans are grantees or other recipients of money from the United States Government within the meaning of 31 U.S.C. §3729(b)(2)(A)(ii). All such money is to be spent to advance the United States' interest in effectuating the purposes of the CARES Act.

44. Accordingly, Defendants' knowing presentations of false or fraudulent applications to the SBA and bank were violations of 31 U.S.C. § 3729(a)(1)(A).

45. Each presentation of a false or fraudulent claim to the SBA or bank is a separate violation of the FCA.

46. By reason of the false or fraudulent claims that Defendants knowingly presented, the United States has been damaged in an amount to be proven at trial.

## COUNT II - FEDERAL FALSE CLAIMS ACT: FALSE RECORD OR STATEMENT

47. Relator incorporates by reference paragraphs 1-39.

48. As described above, Defendants knowingly made and used false records and statements when they caused claims for payment to be submitted to the SBA, including false statements that MCA was eligible to receive PPP loans.

49. The making and use of these false records or statements caused the SBA to pay out monies that it would not have paid if it had known of the falsity of Defendants' records and statements.

50. The SBA and the banks administering PPP loans are grantees or other recipients of money from the United States Government within the meaning of 31 U.S.C. § 3729(b)(2)(A)(ii). All such money is to be spent to advance the United States' interest in in effectuating the purposes of the CARES Act.

51. Accordingly, Defendants' knowing making and use of false records or statements material to false or fraudulent claims for payment submitted to the SBA and bank were violations of 31 U.S.C. § 3729(a)(1)(B).

52. Each making or use of a false record or statement to the SBA or bank is a separate violation of the FCA.

53. By reason of the false or fraudulent records or statements that Defendants knowingly made or used, the United States has been damaged in an

amount to be proven at trial.

## COUNT III (IN THE ALTERNATIVE) FEDERAL FALSE CLAIMS ACT: AVOIDING OBLIGATION

54. Relator incorporates by reference paragraphs 1-39.

55. In the alternative to Counts I and II, Defendants knowingly concealed or improperly avoided their obligation to return PPP loans to the SBA for which MCA was ineligible. Defendants knew that MCA was ineligible for PPP loans, and that accordingly each PPP payment they received was an overpayment from the SBA.

56. The SBA and the banks administering PPP loans are grantees or other recipients of money from the United States Government within the meaning of 31 U.S.C. § 3729(b)(2)(A)(ii). All such money is to be spent to advance the United States' interest in in effectuating the purposes of the CARES Act.

57. Accordingly, Defendants' knowing concealment or avoidance of their obligations to repay the SBA were violations of 31 U.S.C. § 3729(a)(1)(B).

58. Each instance thereof is a separate violation of the FCA.

59. By reason of Defendants' concealment and avoidance of their obligations to repay the SBA, the United States has been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relator respectfully requests that this Court enter judgment in her favor and that of the United States and against Defendants, granting the

following on all Counts:

    (A)    an award to the United States for treble its damages, a statutory penalty for each violation of the FCA, and for its costs pursuant to 31 U.S.C. § 3729(a)(3);

    (B)    an award to Relator in the maximum amount permitted under 31 U.S.C. § 3730(d), and for the reasonable attorney's fees and costs he incurred in prosecuting this action;

    (C)    awards to the United States and Relator for pre- and post-judgment interest at the rates permitted by law; and

    (D)    an award of such other and further relief as this Court may deem to be just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Relator demands trial by jury on all questions of fact raised by the Complaint.

Respectfully submitted,

Dated: September 2, 2021    **/s/ Benjamin H. Yormak**
Benjamin H. Yormak
Florida Bar Number 71272
Trial Counsel for Relator
YORMAK EMPLOYMENT & DISABILITY LAW
9990 Coconut Road
Bonita Springs, Florida 34135
Telephone: (239) 985-9691
Fax: (239) 288-2534
Email: byormak@yormaklaw.com